### UNITED STATES v. BROWN.

### No. 982.

Circuit Court of Appeals, Tenth Circuit.

Aug. 13, 1934.

Edgar C. Jensen, Asst. U. S. Atty., of Salt Lake City, Utah, and Thos. E. Walsh, Atty., Dept. of Justice, of Washington, D. C. (Dan B. Shields, U. S. Atty., and John S. Boyden, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for the United States.

Oscar W. Worthwine, of Boise, Idaho (Jos. G. Jeppson, of Salt Lake City, Utah, and Jess Hawley, of Boise, Idaho, on the brief), for appellee.

Before LEWIS, PHILLIPS, and Mc-DERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

From a judgment in favor of Merl William Brown on a policy of war risk insurance, the United States has appealed.

Pending the appeal Brown died, and Emma Elmira Brown, administratrix of his estate, was duly substituted as appellee.

At the trial the United States by proper motion raised the question of the sufficiency of the evidence to establish that Brown became totally and permanently disabled while his policy was kept in force by payment of premiums.

The evidence considered in the light most favorable to Brown established these facts: Brown enlisted in the United States Marine Corps on August 9, 1917. While in the service he was granted a policy of war risk insurance for $10,000. No premiums were paid on such policy after discharge, and unless he became totally and permanently disabled on or before April 10, 1919, the policy lapsed.

While in training at Mare Island, Brown contracted the measles and was confined to his bed for about two weeks. He had an attack of rheumatism while on board ship en route to France. After reaching France he contracted the mumps and was in the hospital about ten days. After his discharge from the hospital he was sent to the Verdun front. While he was there it rained almost constantly, there was considerable water in the trenches, and the men were given only two meals a day.

While at the front Brown was gassed with mustard gas and was taken to the field hospital, where he remained about four weeks. He was then assigned to light duty, but shortly thereafter a doctor ordered him to a base hospital, where he stayed about three weeks. He ran a temperature of 104°, and suffered from pains in his head, chest, back of his neck, and across his hips. He was removed to American Base Hospital No. 13, where he remained about one week, and was then assigned to light duty. He continued to suffer from pains in his shoulders, the back of his neck, and in his chest, and was short of breath. He was returned to Quantico, Virginia, on January 10, 1919, and on January 15, 1919, went home on furlough. He tried to dance, but could not because of shortness of breath. He returned to Quantico where he was discharged, with a surgeon's certificate of disability, on March 31, 1919. He then returned to his home at Levan, Utah. In June of that year he tried to help paint a barn but after a few hours work he had to quit because of nausea and pains in his head. After a day and a half of rest he again attempted it, but was forced to quit after working a portion of a day, because of illness.

From March, 1920, to June, 1922, Brown took vocational training at the Agricultural College at Logan, Utah. He studied animal husbandry for six months and then changed to a course in mechanics. During those years he missed three or four days each month because of sickness. He suffered from frequent headaches, and walking up steps caused a shortness of breath and pains in the region of his heart. After finishing his course, he worked for the Intermountain Electric Company for five months at a salary of $100 a month. During that time any exertion caused him to have pains in the region of his heart, and there were times when illness prevented him from working. He next worked for the Los Angeles & Salt Lake Railroad Company as a machinist helper, from November, 1922, to October, 1924. During that time he had headaches in the morning and occasionally was unable to eat his lunch. He frequently crawled into an engine cab and rested. He was called back to work in January, 1925, but was unable to go on account of sickness.

From about July, 1925, until 1927, Brown worked for the Wattis-Kimball Motor Company. This employment he obtained through Freestone, an army buddy. Brown was put on light work, and even then was off from time to time on account of sickness. Mr. Kimball, manager of the garage, testified that Brown was incapacitated and unable to do heavy work, and was off so much that he gave him lighter work. In September, 1927, he started to work for Mrs. Wattis. His duties consisted of driving her car, taking care of the lawn, and keeping the sidewalks about the house clean. Mrs. Wattis testified that Brown had difficulty in cutting the lawn, as he would become short of breath and dizzy, and that she had to hire someone to help him. During the time he worked for Mrs. Wattis, he was off about two days each week on account of headaches, nose bleed, dizzy spells, and shortness of breath.

It was admitted that he became totally and permanently disabled in January, 1929.

At the time of Brown's discharge from the Army, the Board of Survey consisting of three doctors found the following:

"Patient was gassed April 13, 1918. Was in hospital until June, has been unable to do duty since then. because of shortness of breath and palpitation on exertion. Examination shows some chronic bronchitis and a moderate degree of tachycardia. He is unfit for full duty in his present condition."

On August 6, 1919, he was examined by Dr. Crimson, a physician in the United States Public Health Service, who reported as follows:

"Diagnosis: 1. Interstitial nephritis chronic. 2. Hypertrophied heart (left vent.) with probable myocarditis. 3. Pyorrhea Alveolaris.

"Prognosis: Guarded until poor compensation indicated by pulse pressure ratio is improved."

Attached to the report were special findings on the heart and blood pressure as follows:

"First sound loud, quick, accentuated; 2nd sound accentuated, Second aortic sound accentuated, snappy; 2nd pulmonic accentuated. Pulse 96 sitting, 120 sitting. Temperature 98 2/5°. Blood pressure:

"Aug. 3, 1919—systolic 170, diastolic 130, pulse pressure 40.

"Aug. 4, 1919—systolic 170, diastolic 140, pulse pressure 30, systolic 164, diastolic 130, pulse pressure 34."

This diagnosis was confirmed by further examinations by physicians for the Veterans' Bureau made in July, 1922; January, April, and August, 1926; August, 1927; June and August, 1928, and January, 1929. In 1922 the report included chronic bronchitis. During the period covered by such examinations, Brown's blood pressure ranged from 158 systolic and 110 diastolic to 190 systolic and 130 diastolic, indicating a severe case of arteriosclerosis.

Dr. Dumke testified that he examined Brown in April, 1928, and diagnosed his case as hypertension and myocarditis, and that strenuous work would aggravate the disease.

Dr. Clawson testified that he examined Brown in September, 1930, and April and May, 1931, and found his blood pressure ranged from systolic 196 and diastolic 140 to systolic 210 and diastolic 140; that he had a severe case of vascular hypertension, arteriosclerosis, and chronic myocarditis; that the recognized treatment for myocarditis and high blood pressure is rest and freedom from stress or worry; that there is no treatment for arteriosclerosis; that Brown had symptoms of high blood pressure at the time of his discharge from the Army, and that he was totally and permanently disabled at that time; and that he should not have engaged in any work that required physical exertion.

The testimony of lay witnesses tended to support Dr. Clawson's opinion that Brown was totally and permanently disabled at the time of his discharge.

The United States contends that Brown's work record refutes the claim of total and permanent disability. Employment may be of such a nature and duration that it conclusively refutes any idea of total and permanent disability. On the other hand a person who is incapacitated to work, impelled by necessity and aided by a strong will, may engage in work that aggravates his condition and hastens his death. See Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170, 172, 173; United States v. Phillips (C. C. A. 8) 44 F.(2d) 689, 691; Lumbra v. United States, 290 U. S. 551, 560, 54 S. Ct. 272, 78 L. Ed. 492.

One who has a serious and incurable ailment, for which rest is the recognized treatment and which will be aggravated by work of any kind, is nevertheless totally and permanently disabled, although he may for a time engage in gainful employment. One so incapacitated may only work at the risk of injury to his health and danger to his life. Note 1.

We are of the opinion that the evidence established that on and prior to his discharge, Brown was suffering from serious and incurable ailments, and that any kind of labor would have aggravated his condition and hastened his death.

Brown entered the service a strong, healthy young man; he came out a physical wreck. He was evidently a man of strong

Note 1. Lumbra v. United States, 290 U. S. 551, 560, 54 S. Ct. 272, 78 L. Ed. 492; Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170, 173; United States v. Phillips (C. C. A. 8) 44 F.(2d) 689, 691; Carter v. United States (C. C. A. 4) 49 F.(2d) 221, 223; United States v. Lawson (C. C. A. 9) 50 F.(2d) 646, 651; United States v. Burleyson (C. C. A. 9) 64 F. (2d) 868, 872; United States v. Sorrow (C. C. A. 5) 67 F.(2d) 372; United States v. Spaulding (C. C. A. 5) 68 F.(2d) 656.

In United States v. Sorrow, supra, the court said:

"One is totally disabled when he is not, without injury to his health, able to make his living by work."

will-power, and of unusual moral and physical courage. He had only an eighth-grade education. He took vocational training and attempted various kinds of work; he earnestly endeavored to earn a livelihood. There was evidence that the work he did aggravated his physical condition and hastened his death.

We conclude that the court properly submitted the issues to the jury. The judgment is affirmed.